**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: January 07 2010**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 08-34601 |
| | ) | |
| Ernest V. Frye and | ) | Chapter 7 |
| Sharon Stone-Frye, | ) | |
| | ) | Adv. Pro. No. 08-3364 |
| Debtors. | ) | |
| | ) | Hon. Mary Ann Whipple |
| Sharon Stone-Frye, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| United States Department of Education, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiff Sharon Stone-Frye's complaint against Defendant United States Department of Education ("Department of Education") and substituted Defendant Educational Credit Management Corporation[1] ("ECMC") seeking a discharge of

---

[1] Upon a motion and order to substitute parties [Doc. ## 6, 11], ECMC was substituted as a party defendant as to two of the student loans at issue in this case.

student loan debt as an undue hardship. The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to determine the dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case.[2] Based upon that review, and for the reasons discussed below, the court finds that Plaintiff's student loan debts owed to Defendants cannot be discharged as an undue hardship.

## FINDINGS OF FACT

### I. Plaintiff's Student Loans

Plaintiff's student loans were incurred in 1994 and 1995 when she attended the University of Toledo. She was enrolled in a bachelor of science in nursing program and completed approximately one and one-half years of study in that program. Although Plaintiff was not working when she started school, she eventually had to start working part-time and then full-time in order to pay her bills. As a result, her grades suffered and she left college. As of January 6, 2009, the amount due and owing the Department of Education for the student loans obtained by Plaintiff was $13,154.52, including $10,823.89 in principal and $2,330.63 in interest that accrued at an annual rate of 5.01% or $1.49 per day through June 30, 2009 and thereafter at such rate as established by the Department of Education. [Gov't. Ex. A]. As of September 15, 2009, the amount due and owing ECMC for student loans obtained by Plaintiff was $17,507.60, including $11,985.32 in principal and $5,522.28 in interest and costs, with interest accruing at $1.08 per day. [ECMC Ex. A].

With respect to the debt owed to ECMC, from October 1997 to September 1998 Plaintiff made seven payments of slightly over $100 and an additional payment in June 2000. Except for an eight month period during 1998, Plaintiff had obtained either a deferral or forbearance until April 2005, at which time her loans

---

[2] The court appreciates the quality and thoughtfulness of the post-trial briefs filed in this case, especially in addressing questions raised by the court at trial.

went into repayment status. [*See* ECMC Ex. B, pp. 4 & 7]. Plaintiff has made no payments on the debt owed to ECMC since June 2000. As to the debt owed to the Department of Education, although there is nothing in the record setting forth a specific payment history, she has paid $3,301.11 in principal payments between 1996 and May 2006. [*See* Gov't Ex. A & B]. However, by May 16, 2006, the record shows that Plaintiff had defaulted on her student loan obligations to that agency. [*See* Gov't Ex. A]. Approximately three years ago, Plaintiff contacted the Department of Education and offered to make payments of $50 per month on her student loan debt, an amount she believed she could afford since she was working at that time. However, according to Plaintiff, she was told this amount was not acceptable and no payments were made. She had also previously been told that she could not request any further forbearance. More recently, Plaintiff was offered participation in the government's income contingent repayment plan, which would require her at this time to make monthly payments in the amount of $65. According to Plaintiff, she declined this offer because she is not working at this time and did not know if she could maintain payments at that level.

## II. Plaintiff's Employment History and Financial Circumstances

Plaintiff is 55 years old and lives with her husband who is 59 years old. In 1993, Plaintiff obtained a State-tested Nursing Assistant ("STNA") license. From 1994 to June 2004, she worked "on and off" through a health care agency in area nursing homes and as a home health care aide earning $9.50 per hour. Plaintiff's STNA license expired sometime before 2004 while working as a home health care aide. She testified that she cannot afford to pay for the refresher course necessary to reinstate her license. She also testified that although an STNA license is required to work in nursing homes, it is not required to work as a home health care aide. Plaintiff did not work between June 2004 and December 2007, except for a short time in early 2007 when she returned to work as a home health aid. However, she quit working after sustaining a rotator cuff injury when lifting a patient. In December 2007, she obtained a part-time position at Kohl's Department Store. Her position there included stocking merchandise, setting up and tearing down seasonal displays, pricing merchandise, cashier duties, and working with customers. However, she was fired from that position in December 2008 due to calling off work too frequently and has been unemployed since.

Plaintiff testified that she has not looked for work since that time because both her and her husband's health conditions require her to miss so much work. In 2003, Plaintiff had arthroscopic surgery on her right shoulder for a pinched nerve, bursitis and a bone spur. She last saw her doctor for this condition approximately eighteen months ago. At that time, her doctor limited her to lifting no more than twenty

3

pounds. She testified that she still treats the condition with ice bags, exercise and a transcutaneous electrical nerve stimulation ("TENS") unit. In 2007, Plaintiff had rotator cuff surgery on her left shoulder. After four months of physical therapy, she was released with a twenty pound weight restriction and a prescription for an anti-inflammatory drug. She testified that her shoulders "are not 100 percent" and that she must sleep on them very carefully.

In September 2009, Plaintiff had back surgery for a fused disc in her lower back and is expecting to be in physical therapy for two to three months. At trial, Plaintiff put on a back brace before taking the witness stand. She testified that a complete recovery in approximately one year is anticipated. According to Plaintiff, her doctor told her the surgery would relieve the pain radiating down her legs that she had been experiencing but, since she has degenerative disc disease, she will still have some pain. She further testified that she does not yet know if she will be able to go back to work and that the surgeon will make that decision "down the road."

Other health conditions of Plaintiff include chronic obstructive pulmonary disease and mild emphysema, for which two inhalers are prescribed, and depression, for which medications are also prescribed. Plaintiff presented to her doctor an application for discharge of her student loan debt based on a total and permanent disability. The application requires a physician to certify that she is "unable to work and earn money because of a condition that is expected to continue indefinitely or result in death." Plaintiff testified that her doctor refused to complete the required certification and that she believes Plaintiff's ability to work is "up in the air."

As to her husband's health issues, Plaintiff testified that he was diagnosed with bladder cancer in 1997. Although he was very sick during the treatment he received for the cancer, he is now in remission. She testified her husband was forced to retire from Daimler Chrysler in 1998 due to suffering from chronic positional vertigo, which, according to Plaintiff and her husband, causes him to become dizzy or unsteady in large, open spaces. At trial, he wore a large brimmed hat in order to prevent him from sensing the openness of the brightly lighted courtroom. Although he walked with a cane, he was able to enter and leave the courtroom without additional assistance. Plaintiff's husband testified that there are better medications now than when he was first diagnosed with chronic positional vertigo and, although he still uses a cane, he is now able to walk "without a wobble." He has fallen down stairs in their home several times in the past, but they have now moved to a one-story home. Plaintiff's husband also has hypertension and has had two neck surgeries and arthroscopic knee surgery.

Plaintiff testified that her husband is on a number of medications, including pain medication, that he takes, at most, three times per day. He also uses a TENS unit two to three times per day on his back, shoulders and right knee. He requires help in applying the TENS unit patches on his back. Plaintiff also helps her husband with such things as getting out of the bathtub and reminding him to take his medications, which she testified he frequently forgets. Nevertheless, the court does not credit the testimony of either Plaintiff or her husband that his care prevents her from being able to work. A family friend that testified at trial stated that Mr. Frye "stays on the couch and watches television" most of the time. However, he is also able to engage in other activities without any assistance, such as preparing meals and driving a car. To the extent that he needs help with bathing and applying the TENS unit patches, Plaintiff could do so around her work schedule. Similarly, the timing of his medications, none of which must be taken more than three times per day, could be arranged before and after work with a mid-day reminder by telephone if necessary. Also, his ability to deal with stairs in their home is no longer an issue since they now live on one floor.

Except for her one year of working at Kohl's Department Store in 2008, since 2004, Plaintiff has depended on her husband as her sole source of support. Their current monthly household income totals $2,742, consisting of his social security and retirement income. Although Plaintiff and her husband received substantial income tax refunds of between $3,317 and $5,283 in each of years 2004 through 2006, those refunds were largely due to the fact that they stepped up to the plate to support two minor grandchildren when their own parents could not do so and, at the time, were eligible for the child tax credit and earned income credit. That is no longer the case and their grandchildren no longer live with them. In contrast, their more routine tax refunds in 2007 and 2008 were $557 and $816, respectively. [EMC Ex. E].

The household expenses for Plaintiff and her husband, as reported in a revised Schedule J admitted into evidence, shows monthly expenses of $3,200. [*See* Pl. Ex. 6, pp. 2-3]. Those expenses include a housing rental expense of $600, expenses of $700 for food, $80 for clothing, $420 for transportation, $386 for medical expenses, $140 for auto and renters insurance, and car payments of $351 for their 2005 Dodge Caravan, which they purchased in 2005, and $161 for their 1998 GMC Sonoma pick-up truck. Plaintiff testified that a large part of their transportation expense is for needed car repairs, including a new engine in the pick-up truck. Although their monthly medical expense of $386 includes a $78 cost of dental insurance that they are not paying, it does not otherwise include either dental or vision expenses. Both Plaintiff and her husband have been diagnosed with cataracts and will require future surgery to remove the cataracts as well as eye glasses thereafter.

Since filing their bankruptcy petition, Plaintiff and her husband have surrendered their home and are now renting a house that has reduced their monthly housing expense by $150. And while Plaintiff and her husband clearly live modestly, foregoing for example cable television and recreation expenses, the court finds other expenses excessive given Plaintiff's overall circumstances. Specifically, the court finds that her household grocery expense of $700 is excessive in light of the United States Department of Agriculture's report of the average monthly cost for food for a family consisting of two people over the age of fifty. [*See* ECMC Ex. P (showing the monthly cost of a low-cost food plan to be $422.60 and of a moderate-cost plan to be $521.60)]. The court also finds that Plaintiff's household expenses of approximately $1,050 per month associated with owning and maintaining two vehicles are excessive. Neither Plaintiff nor her husband are working, and Mr. Frye cannot work due to his disability. When asked about the need for two cars, Plaintiff testified that a second car is necessary in case one car breaks down and because neither she nor her husband are well and they have a number of doctor's appointments. However, there is no indication that the timing of their doctor's appointments cannot be coordinated to eliminate the need for two vehicles. The court finds that owning two vehicles is a family convenience, not a necessity, and that the cost associated with the convenience of a back-up vehicle is unreasonable.

Plaintiff filed her Chapter 7 petition on August 28, 2008. She has minimal or no non-exempt assets that could be used to pay her student loan debt. On December 4, 2008, she commenced this adversary proceeding seeking a discharge of her student loan debt as an undue hardship.

## LAW AND ANALYSIS

Plaintiff seeks to discharge her student loan debt based upon the "undue hardship" exception to nondischargeability of such debt in 11 U.S.C. § 523(a)(8). Section 523(a)(8) provides for the dischargeability of a student loan obligation if "excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents. . . ." The underlying purpose of this provision is "to prevent indebted college or graduate students from filing for bankruptcy immediately upon graduation, thereby absolving themselves of the obligation to repay their student loans." *Tenn. Student Assistance Corp. v. Hornsby (In re Hornsby)*, 144 F.3d 433, 436-37 (6th Cir. 1998).

Although the Bankruptcy Code does not define "undue hardship," the Sixth Circuit has adopted the test set forth in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) for determining the existence of "*undue* hardship." *See Oyler v. Educ. Credit Mgmt. Corp. (In re Oyler)*, 397 F.3d 382, 385 (6th Cir. 2005).

6

> Under the *Brunner* test, the debtor must prove each of the following three elements:
>
> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 385 (quoting *Brunner*, 831 F.2d at 396).

Although the Sixth Circuit has authorized courts to grant a partial discharge of student loan debt pursuant to § 105(a), such equitable adjustment is appropriate only where the undue hardship requirement of § 523(a)(8) is met as to the part discharged. *Miller v. Pa. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 622 (6th Cir. 2004). Before *Oyler,* courts in the Sixth Circuit at times found equitable adjustment of student loan debt under § 105(a) to be appropriate when debtors had a present inability to pay their entire student loan debt but did not satisfy the second or third prong of the *Brunner* test, that is, they failed to show that their financial adversity was likely to persist for a significant portion of the repayment period or that they had made good faith efforts to repay the loans. *See, e.g., Flores v. U.S. Dept. of Education (In re Flores)*, 282 B.R. 847 (Bankr. N.D. Ohio 2002); *Garybush v. U.S. Dept. of Education (In re Garybush)*, 265 B.R. 587 (Bankr. S.D. Ohio 2001). Under *Oyler,* however, all three prongs of the *Brunner* test must now be satisfied for the court to find undue hardship. As undue hardship must exist with respect to any part of a student loan debt that is discharged, equitable adjustment of the debt can only come into play under the court's analysis of the first prong of the *Brunner* test. A debtor seeking an undue hardship discharge bears the burden of proof by a preponderance of the evidence. *Chime v. Suntech Student Loan (In re Chime)*, 296 B.R. 439, 443 (Bankr. N.D. Ohio 2003).

The first prong of the *Brunner* test contemplates that a debtor is first entitled to provide for basic needs for food, clothing, shelter, medical care and transportation for herself and her dependents, if any, before repaying student loan debts. In applying this test, the court must therefore evaluate a debtor's household income and expenses, focusing particularly on what expenses are necessary to realistically maintain a basic standard of living and then determining whether there is income left over with which to pay student loan debts.

In this case, Plaintiff is unemployed. Her monthly household income, consisting entirely of her husband's social security and retirement income, is $2,742. Her monthly household expenses total $3,200, leaving a shortfall of $458. However, as discussed above, some of Plaintiff's household expenses are

7

excessive given her circumstances. The current $458 shortfall could be addressed by adjusting the household food budget and by eliminating the expenses associated with owning and maintaining the pick-up truck. Plaintiff's household budget, however, has little room for further adjustments and tax refunds are not routinely going to be a source of funding for loan payments. As such, she presently has no ability to make payments on her student loans. Plaintiff has met her burden with respect to the first prong of the *Brunner* test.

Under the second prong of the *Brunner* test, a debtor's financial adversity is required to be more than a temporary state of affairs. *Hatfield v. William D. Ford Fed. Direct Consol. Program (In re Hatfield)*, 257 B.R. 575, 582 (Bankr. D. Mont. 2000); *see also Hornsby*, 144 F.3d at 437 ("Courts universally require more than temporary financial adversity. . ."). A debtor must show additional circumstances indicating that her distressed state of financial affairs is likely to persist for a significant portion of the repayment period. *Oyler*, 397 F.3d at 386. "Such circumstances must be indicative of a 'certainty of hopelessness, not merely a present inability to fulfill financial commitment.'" *Id.* (citing *In re Roberson,* 999 F.2d 1132, 1136 (7th Cir. 1993)). Implicit in this requirement is that the debtor's financial state be the result of events that are out of the debtor's control. *Kirchhofer v. Direct Loans (In re Kirchhofer)*, 278 B.R. 162, 167 (Bankr. N.D. Ohio 2002). Thus, the debtor must establish that she has taken all steps possible to improve her financial situation. *Id.* This requirement thus gives effect to the clear congressional intent – exhibited by the use of the word "undue" in § 523(a)(8) – that a student loan obligation be more difficult to discharge than that of other nonexcepted debts. *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088-89 (9th Cir. 2001).

Plaintiff has failed to meet her burden under the second prong of the *Brunner* test. Plaintiff's state of financial affairs is the result of her unemployed status. Her husband's income is generally sufficient to meet their household expenses as set forth above so that, if Plaintiff returns to work on even a part time basis she would have funds to apply to her student loan obligations. *See Halverson v. U.S. Dept. of Educ. (In re Halverson)*, 401 B.R. 378, 386 (Bankr. D. Minn. 2009) (explaining that "a spouse's income is considered not to increase a debtor's gross income but rather to the extent that it decreases [her] monthly expenses"). While it may be true that Plaintiff's student loan debt was incurred before her marriage and that it would be unfair to expect her husband to pay all of her personal expenses just so she can make payments on that debt obligation, *see id.,* she would have funds to make student loan payments even if she would contribute some of her income to pay a portion of the household expenses now paid solely by her husband.

Her asserted inability to work is based both on her own medical issues and on the care that she

8

provides to her husband. However, as discussed above, Plaintiff has not shown that her husband's care would prevent her from being able to work at all. As to her own medical condition, to satisfy *Brunner's* second prong, Plaintiff must "precisely identify [her] problems and explain how [her] condition would impair [her] ability to work in the future." *Barrett v. Educ. Credit Mgmt. Corp. (In re Barrett)*, 487 F.3d 353, 359-60 (6th Cir. 2007). At best, Plaintiff's testimony reveals that neither she nor her doctors have yet concluded that she will not be able to return to work. At the time of trial she was just beginning physical therapy following her back surgery. She testified that any decision as to whether she can return to work will be made by the surgeon "down the road" and that her family doctor believes Plaintiff's ability to work is "up in the air." This testimony falls short of proving that her financial adversity due to her inability to work now is more than a temporary state of affairs.

Finally, under the third prong of the *Brunner* test, a debtor must demonstrate that she has made a good faith effort to repay the loan in issue. In this case, Plaintiff has made only eight payments on her student loan debt owed to ECMC, and no payments at all in the past nine years. Nevertheless, this fact alone does not automatically foreclose a finding of good faith. The good faith requirement does not mandate that payments must have been made when the debtor's circumstances made such payment impossible. *See Alston v. U.S. Dept. of Educ. (In re Alston)*, 297 B.R. 410, 414 (Bankr. E.D. Pa. 2003); *Grove v. Educ. Credit Mgmt. Corp. (In re Grove),* 323 B.R. 216, 226 (Bankr. N.D. Ohio 2005). As one court explained, the good faith standard is really a question of overall good faith in regard to the student loan, and the good faith analysis is driven by the totality of the circumstances. *Afflitto v. United States (In re Afflitto)*, 273 B.R. 162, 171 (Bankr. W.D. Tenn. 2001). Factors courts typically consider in this analysis include the following:

> (1) whether debtor's failure to repay a student loan obligation is truly from factors beyond the debtor's reasonable control;
> (2) whether debtor has realistically used all available financial resources to repay the debt:
> (3) whether debtor is using her best efforts to maximize earning potential;
> (4) the length of time after the loan first becomes due after debtor seeks to discharge the debt;
> (5) the percentage of student loan debt in relation to debtor's total indebtedness; and
> (6) whether debtor obtained any tangible benefit from the student loan obligations.

*Flores v. U.S. Dept. of Educ. (In re Flores)*, 282 B.R. 847, 856 (Bankr. N.D. Ohio 2002).

This is not a case in which a debtor is seeking a discharge of student loan debt when on the verge of reaping the benefit of her education. Plaintiff filed her petition over ten years after attending college, and she obtained no tangible benefit from her student loan obligations. And although her student loan debt

9

constitutes nearly 75% of her unsecured debt,[3] the court does not find that to be a significant fact in its good faith determination. Rather, Plaintiff's failure to demonstrate any of the first three factors set forth above convinces the court that she has failed to meet her burden of showing a good faith effort to repay her loans.

As to the student loan debt owed to ECMC, Plaintiff had obtained either a deferral or forbearance until April 2005, with the exception of an eight-month period in 1998 during which she made seven payments on her student loans. She also made an additional payment in June 2000. At least until April 2005, Plaintiff maintained contact with ECMC with respect to her loans and utilized the administrative remedies available to her. While the court assumes that she was able to utilize those remedies because her circumstances warranted them at the time, she was informed that she is no longer entitled to use those administrative remedies. Nevertheless, since her loans went into repayment status in 2005, she has failed to make any payments on them. And although Plaintiff has paid $3,301 of the principal owed on her student loan debt owed to the Department of Education, she has been in default with respect to that debt since May 15, 2006.

The reason asserted by Plaintiff for failure to make payments on her student loans after they became due is that she could not afford to do so because, except for a short time early 2007, she was not working. Her stated reason for not working was her own medical conditions and the need to care for her husband in light of his medical conditions. However, for the reasons discussed above, the court does not believe that the care Plaintiff provides her husband reasonably should have prevented her from working since 2005. And the court finds Plaintiff's testimony regarding her own physical limitations does not support an inability to work. Although Plaintiff was restricted to lifting no more than twenty-pounds after her right shoulder surgery in 2003 and again after her left shoulder surgery in 2007, there is no evidence that such a restriction rendered her generally unemployable, or even specifically unemployable in the home health care field. *See Jones v. Educ. Credit Mgmt. Corp. (In re Jones)*, 392 B.R. 116, 129 (Bankr. E.D. Penn. 2008) (explaining that student loan borrowers must seek employment opportunities in other fields when positions in their chosen field are unavailable). Plaintiff also testified that she has degenerative disc disease that worsened while working at Kohl's during 2008 due to lifting more than twenty pounds, which ultimately resulted in back surgery in September 2009. While this condition will apparently impair her ability to work in the near

---

[3] Plaintiff's bankruptcy Schedule F lists student loan debt of only $16,254.27. [*See* ECMC Ex. I]. However, at trial, the evidence shows that her student loan debt totals approximately $31,000.00.

10

future, there is no evidence regarding its impact on her ability to work between 2005 and 2007, before the condition was exacerbated by the heavy lifting she did at Kohl's.  *See Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 326-27 (4th Cir. 2008) (explaining that "a determination of good faith under part three [of the *Brunner* test] necessarily includes a retrospective analysis because it focuses on the debtors' prior actions").  On this evidence, the court cannot conclude that Plaintiff's failure to make payments on her student loan obligations when the loans were in repayment status was due to factors beyond her reasonable control or that she used her best efforts to maximize her earnings during the relevant time period.

The evidence also does not support a finding that Plaintiff used all available financial resources to repay her student loan debt.  She worked part-time throughout 2008 and yet made no payments during that time, notwithstanding the fact that her original bankruptcy Schedules I and J filed in August 2008 with her petition shows income covering all expenses, which include a $100 student loan payment.  During this time, Plaintiff also declined to consolidate her loans and participate in the income contingent repayment plan, which would have required a payment of only $65 per month.  *See Tirch v. Penn. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 682-83 (6th Cir. 2005) (explaining that, while not determinative, the availability of advantageous administrative payment alternatives is a relevant factor to be considered by the court in addressing good faith repayment efforts). The court finds that Plaintiff has not met her burden of proving the third prong of the *Brunner* test that she made good faith efforts to repay the loans.

## CONCLUSION

Plaintiff having failed to meet all three prongs of the *Brunner* test, the court cannot find that payment of her existing student loan debt, or any part thereof, would be an undue hardship. Judgment will, therefore, be entered on the complaint in favor of Defendants.  A separate judgment effecting this Memorandum of Decision will be entered by the court.